No. 83,554

Doris Zimmerman, as Guardian and Next Friend of Cole D. Zimmerman, a Minor, *Appellee,* v. Mahaska Bottling Company, Pepsi Cola Bottling of Salina, and Vendo Company, *Appellants.*

(19 P. 3d 784)

Opinion filed March 9, 2001.

*Kelly A. Ricke*, of Fisher, Patterson, Sayler & Smith, L.L.P., of Overland Park, argued the cause, and *David P. Madden*, of the same firm, was with her on the brief for appellants Mahaska Bottling Company and Pepsi Cola Bottling of Salina.

*James M. Crowl*, of Dickson & Pope, P.A., of Topeka, argued the cause and was on the brief for appellee.

*J. Nick Badgerow*, of Spencer, Fane, Britt & Browne, L.L.P., of Overland Park, was on the brief for *amicus curiae* National Federation of Paralegal Associations, Inc., Kansas Paralegal Association, and Kansas City Paralegal Association.

The opinion of the court was delivered by

ABBOTT, J.: This is an interlocutory appeal from the district court's order disqualifying the law firm of Fisher, Patterson, Sayler & Smith (Fisher Patterson) from representing the appellants in this suit. The district court found that Kay French, a legal secretary, acquired material and confidential information regarding this per-

sonal injury lawsuit while employed at Dickson & Pope, the firm retained by the appellee, and that her current employment with Fisher Patterson required disqualification of the firm.

Cole Zimmerman, a minor, was injured when a soda pop vending machine tipped over onto him. Cole's mother, Doris Zimmerman, retained the law firm of Dickson & Pope to represent her and her son. A negligence and products liability suit was filed against Vendo Company, the vending machine manufacturer, Pepsi Cola Bottling of Salina (Pepsi), and Mahaska Bottling Company (Mahaska), whom Zimmerman alleged to be the sellers of the soda pop that filled the machine.

The Overland Park office of Fisher Patterson was retained to represent appellants Pepsi and Mahaska. Before the close of discovery, Zimmerman filed a motion to disqualify Fisher Patterson on the grounds that Kay French, a former legal secretary at Dickson & Pope, had been hired by the Fisher Patterson Topeka office. French left Dickson & Pope some 9 months after the lawsuit had been filed and nearly 3 years after the accident.

The district court held an evidentiary hearing to determine whether French had acquired material and confidential information during her employment with Dickson & Pope which would require the disqualification of Fisher Patterson. The trial court also considered whether the erection of a "Chinese wall," "screening device," or "cone of silence" was appropriate for nonlawyer personnel switching sides from one firm to another during ongoing litigation.

The district court took in camera testimony from Jill Moffitt, a legal assistant and bookkeeper at Dickson & Pope, from James M. Crowl, the attorney for Zimmerman, and from French. Moffitt, French, and Crowl were also questioned in open court.

French testified that the file for the Zimmerman case was kept in the Overland Park office and that she worked exclusively in the Topeka office. She also testified that she was assigned to a partner who had no involvement with the Zimmerman case. French stated that she had been present when attorneys from Dickson & Pope had discussed the Zimmerman case, but that she did not have an opinion as to the case's worth. French indicated that she did not

know how much money had been spent on the case or know any experts who had been retained. French also testified that she could not recall whether there had been any discussions in front of her about what could have been done to prevent the accident.

Crowl testified that he did not speak with French about confidentiality after she gave her 2-week notice that she was leaving the firm to go to work at Fisher Patterson. Crowl further testified that he filed the motion to disqualify Fisher Patterson after French left Dickson & Pope.

The district court found that French had acquired material and confidential information and that screening would not be an appropriate remedy. The district court stated:

"The Kansas Appellate courts have not adopted or approved the cases relating to imputed disqualification of attorneys for use in cases involving nonlawyers. If the Court is to weigh the testimony given, the Court still has concerns. The Court believes that there has been more knowledge attributed to Kathryn French than French has. However, French does have the benefit of information which may be relevant. In the absence of a rule addressing this situation, the concerns of Dickson & Pope, regarding French's knowledge of settlement matters, deposition testimony strengths/weaknesses and case strategy are legitimate concerns that warrant the granting of the Motion [to disqualify]. If there was a rule that offered screening protection, the results would be different. However, the Court finds there is no such rule.

"The Court further finds that this Order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the Order may materially advance the ultimate termination of the litigation."

This court has jurisdiction over this interlocutory appeal pursuant to Supreme Court Rule 4.01 (2000 Kan. Ct. R. Annot. 28). The issues raised on appeal include (1) whether the district court erred in finding that French acquired material and confidential information regarding Dickson & Pope's representation of Zimmerman; (2) whether the Kansas Rules of Professional Conduct (KRPC) apply to nonattorneys; (3) whether KRPC 1.10(b) (2000 Kan. Ct. R. Annot. 349) allows for the use of "screening devices" to avoid disqualification in situations involving nonattorney employees; and (4) whether the de facto screening used by Fisher Patterson is effective to prevent disqualification of the firm.

We begin our analysis by noting that disqualification of counsel is aimed to protect one attorney-client relationship, but that it also destroys another attorney-client relationship by depriving a party of representation of its own choosing. Motions to disqualify, therefore, should be viewed with extreme caution. *Chrispens v. Coastal Refining & Mktg., Inc.*, 257 Kan. 745, 772, 897 P.2d 104 (1995).

## I. MATERIAL AND CONFIDENTIAL INFORMATION

We first consider whether the district court erred in finding that French acquired material and confidential information regarding Dickson & Pope's representation of Zimmerman.

Where a motion to disqualify an attorney under KRPC 1.10(b) has been filed, the district court must hold a full evidentiary hearing and determine whether the attorney in question acquired material and confidential information during his or her former employment. The court must then make specific factual findings whether the attorney had knowledge of material and confidential information. *Lansing-Delaware Water District v. Oak Lane Park, Inc.*, 248 Kan. 563, Syl. ¶ 1, 808 P.2d 1369 (1991). Where a motion to disqualify has been filed, based on the movement of nonlawyer personnel, the trial court must proceed in the same manner as if the person was an attorney.

When the district court has made findings of fact and conclusions of law, the function of this court on appeal is to determine whether the findings of fact are supported by substantial competent evidence and whether the findings are sufficient to support the district court's conclusions of law. 248 Kan. 563, Syl. ¶ 3.

The district court found that French had acquired material and confidential information regarding the Zimmerman suit which justified granting the motion to disqualify Fisher Patterson. In doing so, the court stated:

"Counsel agree that if Ms. French were an attorney having changed from one firm to another under these circumstances the firm would be disqualified. Kansas Appellate Courts have not adopted nor have they approved any attorney conflict cases, the screening process. The concerns expressed by Mr. Pope and Mr. Crowl certainly I think are legitimate concerns. I think they certainly raise an appearance to their litigant, their client of conflict and if I don't weigh the testimony that anyone, Ms. Moffitt, Ms. French, Mr. Crowl, I think on the face of it the motion

should be granted. If I weigh the testimony of Ms. French and Ms. Moffitt, particularly those two, I still have concerns. I think both Ms. Moffitt and Ms. French were honest in their answers, told the truth as they understand the situation and as they recall. I think perhaps more knowledge was attributed to Ms. French than she may actually possess, but notwithstanding I do think that she has the benefit of some information which on the face of it may not in her mind be information that's really relevant, but when in fact it could be relevant.

"I'm reluctant. I think there needs to be a rule addressing the situation that we have here. That does not exist, and I think in the absence of that under all the circumstances and the proffers that have been made, that the concerns that counsel have for Dickson & Pope regarding possible settlement prospects and monetary value of their client's position with regard to settlement; deposition testimony that has been given, particularly by the plaintiff and how the firm may have assessed that deposition testimony as to its strength and weaknesses; strategy with regard to how to proceed with this trial, what evidence to present and what points in the trial to present it are all legitimate concerns that under all the circumstances I think warrant the granting of this motion. I think if we had a rule in these circumstances that offered the protection from a screening system, results today would be different today than they are. If there is not such a rule that I am aware and counsel has not made me aware of such a rule and that would apply under the facts of this case, I think these kinds of cases are going to have to be determined on a case by case basis."

Because of the nature of this case, discussion of the specific testimony in this opinion is not feasible. The district court's findings of fact were based upon the in camera testimony and also upon the testimony taken in open court. Suffice it to say that French has knowledge of particular facts which are material and confidential regarding the Zimmerman matter. Although she may not be aware of the importance of these facts, they are, nonetheless, material to the case. Upon review of the in camera testimony and the testimony taken in open court, we hold that the district court's findings of fact are supported by substantial competent evidence and that the findings are sufficient to support the district court's conclusion that French had acquired material and confidential information regarding the Zimmerman matter.

## II. PROFESSIONAL CONDUCT RULES APPLY TO NONATTORNEYS

Determination of this issue requires a brief review of the applicable provisions of the KRPC. KRPC 1.10 governs the disqualification of attorneys and their firms and sets forth in pertinent part:

"(a) While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7, 1.8(c), 1.9, or 2.2.

"(b) *When a lawyer becomes associated with a firm, the firm may not knowingly represent a person in the same or a substantially related matter in which that lawyer, or a firm with which the lawyer was associated, had previously represented a client whose interests are materially adverse to that person and about whom the lawyer had acquired information protected by Rules 1.6 and 1.9(b) that is material to the matter." (Emphasis added.)*

*KRPC 1.10 expressly addresses lawyers but does not address nonlawyer employees of a law firm, which is the issue in the present case. KRPC 5.3 (2000 Kan. Ct. R. Annot. 404) governs the general supervisory obligations of lawyers with respect to their nonlawyer employees and sets forth:*

*"With respect to a nonlawyer employed or retained by or associated with a lawyer:*

*"(a) a partner in a law firm shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that the person's conduct is compatible with the professional obligations of the lawyer;*

*"(b) a lawyer having direct supervisory authority over the nonlawyer shall make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer; and*

*"(c) a lawyer shall be responsible for conduct of such a person that would be a violation of the rules of professional conduct if engaged in by a lawyer if:*

*(1) the lawyer orders or, with the knowledge of the specific conduct, ratifies the conduct involved; or*

*(2) the lawyer is a partner in the law firm in which the person is employed, or has direct supervisory authority over the person, and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action." (Emphasis added.)*

### The Comment to KRPC 5.3 sets forth:

*"Lawyers generally employ assistants in their practice, including secretaries, investigators, law student interns, and paraprofessionals. Such assistants, whether employees or independent contractors, act for the lawyer in rendition of the lawyer's professional services. A lawyer should give such assistants appropriate instruction and supervision concerning the ethical aspect of their employment, particularly regarding the obligation not to disclose information relating to representation of the client* and should be responsible for their work product. The measures employed in supervising nonlawyers should take account of the fact that they do not have legal training and are not subject to professional discipline." (Emphasis added.)

The provisions of the KRPC specifically set forth disciplinary rules for lawyers. The provisions of the KRPC apply equally, however, to nonlawyer employees. When KRPC 1.10 and 5.3 are read in conjunction with each other, it is apparent that the rules applicable to lawyers are also applicable to nonlawyers employed in a private firm. See *Daines v. Alcatel*, S.A., 194 F.R.D. 678, 681 (E.D. Wash. 2000) (using Washington Rules of Professional Conduct [WRPC] 5.3 to apply WRPC 1.10 to nonlawyer employees); *Makita Corp. v. U.S.*, 819 F. Supp. 1099, 1104 (CIT 1993) (holding that Model Rule 5.3 requires courts to apply the same ethical standards to nonlawyer employees); *Smart Industries v. Superior Court*, 179 Ariz. App. 141, 146, 876 P.2d 1176 (1994) (holding that Ethical Rule [ER] 1.10[b] "may be extended to the conduct of nonlawyers through ER 5.3"); *Koulisis v. Rivers*, 730 So. 2d 289, 291 (Fla. Dist. App. 1999) (holding that under the applicable Rules Regulating the Florida Bar, which are similar to the KRPC, nonlawyers must be treated in the same manner as lawyers when considering issues of confidentiality and disqualification); *Ciaffone v. District Court*, 113 Nev. 1165, 1168, 945 P.2d 950 (1997) (holding that nonlawyers should be treated identically to lawyers under the Supreme Court Rules of Nevada); *Glover Bottled Gas Corp. v. Circle M Beverage Barn, Inc.*, 129 App. Div. 2d 678, 679, 514 N.Y.S.2d 440 (1987) (applying code of professional responsibility to paralegal in affirming disqualification of firm).

In *Daines*, the court provided rationale for holding nonlawyer employees to the same standards as lawyers, stating:

"This section [WRPC 5.3] charges attorneys with the responsibility of ensuring that nonattorney staff members follow the same ethics rules that apply to attorneys. If those nonattorneys violate those ethical obligations, the supervising attorneys can be held responsible.

"[The imputed disqualification] rule [WRPC 1.10] follows common sense. It is no secret that paralegals and other nonattorney staff members are regularly exposed to confidential client information as a part of their everyday work. Whether by such means as the filing of a confidential client letter in a case file or attendance at a strategical meeting, nonattorneys . . . often acquire sensitive information about their clients. To allow such employees to change firms at random and without concern for the information they have acquired would be to undercut the

rules applicable to attorneys. [WRPC] 5.3 recognizes that fact and this court will apply [WRPC] 1.10's imputed disqualification rule to this case." 194 F.R.D. at 682.

In *Williams v. Trans World Airlines, Inc.*, 588 F. Supp. 1037, 1044 (W. D. Mo. 1984), the court discussed the vital role that nonlawyers have in litigation and the need to apply the same rules as those applied to lawyers, stating:

> "Nonlawyer personnel are widely used by lawyers to assist in rendering legal services. Paralegals, investigators, and secretaries must have ready access to client confidences in order to assist their attorney employers. If information provided by a client in confidence to an attorney for the purpose of obtaining legal advice could be used against the client because a member of the attorney's nonlawyer support staff left the attorney's employment, it would have a devastating effect both on the free flow of information between client and attorney and on the cost and quality of the legal services rendered by an attorney. Every departing secretary, investigator, or paralegal would be free to impart confidential information to the opposition without effective restraint. The only practical way to assure that this will not happen and to preserve public trust in the scrupulous administration of justice is to subject these 'agents' of lawyers to the same disability lawyers have when they leave legal employment with confidential information."

In *Ciaffone*, the Supreme Court of Nevada justified application of the rules of ethical conduct to nonlawyer employees, stating:

> "When SCR 187 [similar to KRPC 5.3] is read in conjunction with SCR 160(2) [similar to KRPC 1.10], nonlawyer employees become subject to the same rules governing imputed disqualification. To hold otherwise would grant less protection to the confidential and privileged information obtained by a nonlawyer than that obtained by a lawyer. No rationale is offered by Ciaffones which justifies a lesser degree of protection for confidential information simply because it was obtained by a nonlawyer as opposed to a lawyer. Therefore, we conclude that the policy of protecting the attorney-client privilege must be preserved through imputed disqualification when a nonlawyer employee, in possession of privileged information, accepts employment with a firm who represents a client with materially adverse interests." 113 Nev. At 1168.

Paralegals, secretaries, and other nonlawyer staff are exposed to material and confidential information on a regular basis. Indeed, the jobs they perform could not be done without being exposed to the client's confidences. Because of the nature of their work, nonlawyers working in a firm are "agents" of the lawyers they work for

and the necessity to protect the confidences of the client is tremendous. Clients expect their confidences to be safe within the walls of the firm they choose to represent them. Lawyers have a duty to protect their client's confidences. KRPC 5.3 requires nonlawyers to be treated in the same manner as lawyers when considering confidentiality issues under KRPC 1.10.

## III. SCREENING DEVICES

We next address whether a "screening device" or "Chinese wall" is an appropriate remedy where the person in question is a nonlawyer who has switched sides by moving from one firm to another.

This court has twice held that the use of "screening devices" or a "Chinese wall" is unavailable as a remedy when faced with a KRPC 1.10(b) problem. See *Lansing-Delaware Water District,* 248 Kan. at 573 (rejecting the use of screening devices as a remedy for the "taint" of an incoming attorney who has switched sides during ongoing litigation by moving from one firm to another); *Parker v. Volkswagenwerk Aktiengesellschaft,* 245 Kan. 580, 589, 781 P.2d 1099 (1989) (holding that the model rules "reject . . . any thought that the 'taint' of the incoming lawyer can be cured by screening him or her out of the affected client's matter, or by erecting a 'Chinese wall' or by imposing a 'cone of silence' "). This court has never addressed whether the use of a screening device or Chinese wall is appropriate for nonlawyer employees of a firm.

Although not binding on this court, KBA Ethics Opinion No. 90-05 addresses whether screening is available for nonlawyer employees who have switched firms in order to avoid disqualification and sets forth:

"A law firm that employs a nonlawyer who formerly was employed by another firm may continue representing clients whose interests conflict with the interests of clients of the former employer if (1) the former employing firm and their affected clients consent after consultation, or (2) the employee can meet the burden of proof that he or she did not acquire 'material and confidential information during the course of his former employment.' A screening wall imposed unilaterally is inappropriate to meet this burden under our case law."

In *Williams,* the court considered the risk of nonlawyers leaking confidential information and stated:

"In fact, a persuasive argument can be made that a nonlawyer would be more likely to reveal confidential information. Presumably, an attorney would be acutely aware of his or her ethical obligation not to reveal confidences of a former client. A nonlawyer might not be as sensitive to the need to safeguard the confidences of his or her previous employer gained while working with an attorney." 588 F. Supp. At 1043.

The Nevada Supreme Court rejected the use of a Chinese wall for the nonlawyer employee in *Ciaffone*. The *Ciaffone* court held that screening devices are not a proper or effective remedy when a finding has been made that a nonlawyer employee who has switched firms possesses material and confidential information. The court stated:

" 'Attorney disqualification of counsel is part of a court's duty to safeguard the sacrosanct privacy of the attorney-client relationship which is necessary to maintain public confidences in the legal profession and to protect the integrity of the judicial process.' [Citation omitted.] Moreover, 'a client must be secure in the knowledge that any information he reveals to counsel will remain confidential.' [Citation omitted.] Therefore, we decline to carve out an exception allowing screening of nonlawyers in situations where lawyers would be similarly disqualified." 113 Nev. at 1169.

The appellant cites *Smart Industries* in support of their argument that a screening devise or "Chinese wall" is an appropriate remedy when faced with a nonlawyer who has switched sides by moving from one firm to another. In *Smart Industries*, the Arizona Court of Appeals considered whether the plaintiff's firm which had hired a paralegal who was formerly employed by the defendant's counsel should have been disqualified by the district court. The court held that screening devices are a useful remedy when faced with a situation where a nonlawyer switches sides by moving from one firm to another, but recognized that in jurisdictions where screening devices are not allowed for lawyers, they are not allowed for nonlawyer employees either. The court stated:

"[W]e note that very few jurisdictions have considered the issue, either in the context of litigation case law or in ethical opinions. Those that have addressed the issue tend to apply the same standards to nonlawyers as are applied to lawyers under the jurisdiction's applicable disciplinary rules regarding imputed disqualification. [Citations omitted.]

"Thus, if, under the jurisdiction's applicable ethical rules, a lawyer can be saved from imputing disqualification to his or her new firm by appropriate screening mechanisms, then a paralegal's or secretary's potential conflict in the new firm can be avoided by the same mechanisms, sometimes described as 'Chinese Walls,' or 'cones of silence.' [Citation omitted.] However, if the jurisdiction does not recognize such as 'screening' option as adequate protection against a lawyer's potential conflict in the new firm, then it usually does not recognize such an exception to the imputed disqualification rule for a nonlawyer assistant. See, e.g., *Glover Bottled Gas Corp.*; Kansas Bar Ass'n Ethical Op. No. 90-555." 179 Ariz. App. at 147.

The appellant suggests that there are several policy reasons to treat nonlawyers differently than lawyers and that screening devices can be effectively used to prevent communication of material and confidential information. They are: (1) screening devices will adequately protect the former client's confidentiality concerns; (2) screening balances the interest of the current client in maintaining his or her choice of counsel throughout the litigation; (3) screening would protect the interests of the nonlawyer employee in allowing them greater flexibility to change jobs; and (4) screening is allowed under the rules when a governmental attorney leaves employment with the government and moves to a private firm.

Screening devices, however, are prohibited under the KRPC. There is no provision or exception which allows them for lawyers. Because the provisions of the KRPC apply to nonlawyers as well, we decline to create a screening exception in this case. The need for confidentiality, the trust of the client, and the public's respect for the legal system all support the rule in Kansas prohibiting the use of screening devices.

Although recognizing that nonlawyer employees may have different or special needs from lawyers, the court in *Ciaffone* justified similar treatment, stating:

"The reasoning of *Smart Industries* implicitly recognizes that a nonlawyer's employment opportunities or mobility must be weighed against client confidentiality before disqualification occurs. While this approach may appear fairer to the paralegal/secretary, it has been *roundly criticized* for ignoring the realities of effective screening and litigating that issue should it ever arise. For example, one commentator explained that a majority of courts have rejected screening because of the uncertainty regarding the effectiveness of the screen, the monetary incentive involved in breaching the screen, the fear of disclosing privileged information

in the course of proving an effective screen, and the possibility of accidental disclosures. [Citation omitted.] Accordingly, we conclude that adherence to the existing SCR scheme [disallowing screening for lawyers moving from private firm to private firm] is the better rule. We, therefore, refrain from creating an exception to the imputed disqualification rule embodied in SCR 160." 113 Nev. At 1169-70. (Emphasis added.)

In concluding, the *Ciaffone* court stressed that movement of nonlawyer employees from private firm to private firm does not necessarily require disqualification if the firms are on adverse sides of pending litigation. The court stated:

"This does not mean that anytime a nonlawyer employee changes law firms that the new employer must be disqualified under SCR 160. First, if the nonlawyer employee never obtained confidential information as defined by SCR 156 and 159, no ethical problem arises requiring disqualification. Second, even if a nonlawyer employee had access to privileged information, SCR 160(4) provides that the former law firm and its client may waive disqualification if they are satisfied the present employer law firm is adequately screening the nonlawyer employee." 113 Nev. at 1169 n.3.

As previously mentioned, nonlawyers are privy to a great deal of confidential information regarding the litigation in the office they work in. They are also often involved in legal strategy and planning. The client expects and our legal system requires the client's confidences to be protected. To treat nonlawyers in a different manner than lawyers would seriously erode the foundation of the KRPC and place at risk the public trust in the legal system. Because KRPC 1.10 does not allow for the implementation of a screening device or Chinese wall for lawyers, it likewise does not allow for the use of a screening device for nonlawyers.

Our holding today does not mean that disqualification is mandatory whenever a nonlawyer moves from one private firm to another where the two firms are involved in pending litigation and represent adverse parties. A firm may avoid disqualification if (1) the nonlawyer employee has not acquired material and confidential information regarding the litigation or (2) if the client of the former firm waives disqualification and approves of the use of a screening device or Chinese wall.

The district court's order disqualifying Fisher Patterson from the Zimmerman case is affirmed.

Six, J., not participating.

Robert J. Lewis, Jr., J., assigned.