Wesley OWENS, et al. Plaintiffs

v.

## FIRST FAMILY FINANCIAL SERVICES, INC., et al. Defendants

No. CIV.A. 3:02CV1680BN.

United States District Court,
S.D. Mississippi,
Jackson Division.

July 18, 2005.

Wesley Owens, Pro se.

James German, pro se.

Etta Mae Tucker, Pro se.

Roosevelt Tucker, Jr., Pro se.

Zanetta Fortner, Pro se.

Gino Brown, Pro se.

Rose Bryant, Pro se.

Gloria Wells, Pro se.

Charles E. Gibson, III, Mary Jeanne Gibson, The Gibson Law Firm, Jackson, MS, for Wesley Owens, James German, Etta Mae Tucker, Roosevelt Tucker, Jr., Zanetta Fortner, Gino Brown, Rose Bryant, Gloria Wells, Plaintiffs.

John R. Chiles, Alan D. Leeth, pro hac vice, Eric Foster Hatten, Burr & Forman, LLP, Birmingham, AL, Suzette F. Breland, Young, Williams, Henderson & Fuselier, Jackson, MS, for First Family Financial Services, Inc., Citifinancial, Inc., Associates Financial Life Ins. Co., Defendants.

Charles E. Griffin, Griffin & Associates, Jackson, MS, Walter D. Willson, Randy L. Dean, Wells, Marble & Hurst, Jackson, MS, for Union Security Life Ins. Co., American Security Group, American Sec. Life Ins. Co., Defendants.

## OPINION AND ORDER

BARBOUR, District Judge.

Before the Court is the Motion of Defendants Citifinancial, Inc., First Family Financial Services, Inc., and Associates Financial Life Insurance Company ("Defendants") to Disqualify the attorneys for the Plaintiffs, Charles E. Gibson, III, C. Edward Gibson, IV, Gigi Gibson, and the Gibson Law Firm, filed November 15, 2004. Having considered the Motion, Response, Rebuttal, attachments to each and supporting and opposing authority, the Court finds that the Motion is well taken and that it should be granted.

### I. Factual and Procedural History

Stephanie Wilson ("Wilson") began working as a secretary at Forman Perry Watkins Krutz & Tardy, LLP ("Forman Perry"), in June of 2001. In September of 2001, Wilson was promoted to the position of paralegal. Then, in October of 2001, Wilson was promoted to the position of supervising paralegal. Deposition of Wilson, p. 6, attached as Exhibit "M" to the Motion to Disqualify. In about September or October of 2001, Wilson began working on consumer fraud cases as a paralegal, and then as a supervising paralegal. It is Wilson's involvement in these consumer fraud cases while at Forman Perry that is at issue in this case.

The instant suit was filed on August 30, 2002, just days prior to Wilson's departure from the employ of Forman Perry on September 6, 2002. As of Wilson's departure date, Forman Perry represented Defendants.[1] It is neither clear nor relevant what employment, if any, Wilson main-

---

1. Forman Perry no longer represents Defendants in this suit. Burr & Forman, LLP, has taken over the representation of Defendants and represents the Defendants in this instant Motion.

tained from September 6, 2002, until April 6, 2004. What is clear is that on April 6, 2004, the Gibson Law Firm, which represents the Plaintiffs in this consumer fraud action, hired Wilson, the former employee of Forman Perry. While at Forman Perry, Wilson worked on numerous consumer fraud cases involving the defense of these Defendants. Defendants argue that this transfer in employment has created a conflict within the Gibson Law Firm, and that the conflict of Wilson must be imputed to the entire Gibson Law Firm so that the firm is prevented from representing Plaintiffs. Defendants argue that this is so despite the fact that Wilson no longer works for the Gibson Law Firm, as her employment was recently terminated.

Defendants do not argue that Wilson worked on this particular suit while at Forman Perry. Rather, Defendants argument is targeted against Wilson's participation in the defense of Defendants in numerous consumer fraud cases brought about by numerous Plaintiffs. Defendants argue that a conflict exists at the Gibson Law Firm because Wilson, as a supervising paralegal at Forman Perry, was privy to "a finite and related set of documents and/or materials all of which contain confidential information of these Defendants and are covered by various privileges including, but not limited to, the attorney client privilege and the 'work product doctrine.'" Memorandum in Support of Defendants' Motion to Disqualify, p. 2, filed November 15, 2004. Defendants argue that these documents and materials are identical to the documents and materials at issue in this case, although in this action they apply towards a separate set of Plaintiffs. Defendants further argue that Wilson's participation in the consumer fraud cases of Defendants was extensive, in that she attended strategy meetings and was privy to the settlement amounts of different cases on which she worked. Defendants argue that the cumulative effect of the above participation is that Wilson's working for the Gibson Law Firm is detrimental to Defendants, because during Wilson's work at Forman Perry she was privy to the confidential information that can now be used to the benefit of Plaintiffs in this case.

Based upon the above general allegations, Defendants filed the instant Motion to Disqualify. The Motion is now ripe for consideration.

## II. Legal Standard

■ The Court of Appeals of the United States for the Fifth Circuit has stated that "[m]otions to disqualify are substantive motions affecting the rights of the parties and are determined by applying standards developed under federal law." *In re American Airlines, Inc.*, 972 F.2d 605, 610 (5th Cir.1992). Federal courts may adopt state or American Bar Association ("ABA") rules as their ethical standards, but whether and how these rules apply are questions of federal law. *Green v. Admin. of the Tulane Education Fund*, No. Civ.A. 97–1869, 1998 WL 24424 at *2 (E.D.La. Jan.23, 1998) (citing *In re American*). Pursuant to Local Rule 83.5 of the Rules of the United States District Courts for the Northern District of Mississippi and the Southern District of Mississippi, the United States District Courts for the Northern District of Mississippi and the Southern District of Mississippi have adopted the Mississippi Rules of Professional Conduct.

■ But while "local rules are the most immediate source of guidance for deciding a motion to disqualify, national ethical rules are also relevant to this Court's determination." *Id.* The Court should also consider "the standards of the profession, the public interest, and the litigants' rights." *Hampton v. Daybrook Fisheries, Inc.*, No. Civ. A. 01–1913, Civ. A. 01–2052, 2001 WL 1444933 at *2 (E.D.La. Nov.14,

2001) (citing *In re Dresser Indus.*, 972 F.2d 540, 543 (5th Cir.1992)). In the Fifth Circuit, the following factors should be considered in the disqualification analysis: "whether a conflict has (1) the appearance of impropriety in general, or (2) a possibility that a specific impropriety will occur, and (3) the likelihood of public suspicion from the impropriety outweighs any social interests which will be served by the lawyer's continued participation in the case." *In re Dresser,* 972 F.2d at 544. "[The Fifth Circuit has] applied particularly...the admonition of canon 9 that lawyers should 'avoid even the appearance of impropriety.'" *In re Dresser,* 972 F.2d at 543.

The primary applicable local rules in this instance are Mississippi Rules of Professional Conduct 1.6, 1.9, and 1.10. Rule 1.9 states, in pertinent part:

CONFLICT OF INTEREST: FORMER CLIENT

A lawyer who has formerly represented a client in a matter shall not thereafter:

(a) represent another in the same or a *substantially related matter* in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation;

(b) use information relating to the representation to the disadvantage of the former client except as Rule 1.6 would permit with respect to a client or when the information has become generally known.

(Emphasis added). Rule 1.10(a) states, in turn:

IMPUTED DISQUALIFICATION: GENERAL RULE

(b) When a lawyer becomes associated with a firm, the firm may not knowingly represent a person in the same or a substantially related matter in which that lawyer, or a firm with which the lawyer was associated, had previously represented a client whose interests are materially adverse to that person and about whom the lawyer had acquired information protected by Rules 1.6 and 1.9(b) that is material to the matter.

Rule 1.6 states, in pertinent part:

CONFIDENTIALITY OF INFORMATION

▮ (a) A lawyer shall not reveal information, which is confidential or privileged by law, or relating to representation of a client, which a lawyer has reason to believe may be detrimental to the client or which client has requested not be disclosed.

Application of ethical rules, such as those involved in the instant case, requires a "painstaking analysis of the facts and precise application of precedent." *Brennan's, Inc. v. Brennan's Restaurants, Inc.,* 590 F.2d 168, 173–74 (5th Cir.1979) (quoting *United States v. Standard Oil Co.,* 136 F.Supp. 345, 367 (S.D.N.Y.1955)).[2] "[A] district court's ruling upon a disqualification motion is not a matter of discretion. Rather, the appellate court 'review[s] *findings of fact* for clear error' 'while carefully examining the district court's application of relevant ethical standards.'" *In re American,* 972 F.2d at 611 (emphasis added). However, with regard to *questions of law,* a "district court's interpretation of the state disciplinary rules [is] an interpretation of law, subject essentially to *de novo* consideration." *Id.* at 605.

### III. Analysis

The first argument of Defendants is that pursuant to Rule 1.9(a), the matters on

**2.** The Court notes that with respect to these particular rules of the Mississippi Code of Professional Responsibility, the rules of the ABA Model Code of Professional Conduct are effectively the same.

which Wilson worked at Forman Perry are "substantially related" to the matters in the instant suit. The second argument of Defendants is that pursuant to Rules 1.6 and 1.9(b), Wilson, while working at Forman Perry, was privy to the confidential information of Defendants, and that this information could now be used by the Gibson Law Firm against Defendants in this litigation.

### III.A. Whether the Subject Matter of the Former and Present Representations are Substantially Related

 To determine whether Wilson's work at Forman Perry is substantially related to the work done by the Gibson Law Firm, the Court must apply the "substantial relationship" test: [3]

> 'A party seeking to disqualify opposing counsel on the ground of a former representation must establish two elements: 1) an actual attorney-client relationship between the moving party and the attorney he seeks to disqualify and 2) a substantial relationship between the subject matter of the former and present representations.'

> ...the sole issue is whether these prior representations [of Defendants] are substantially related to the present case. Our inquiry may be narrowed to this single question

because the substantial relationship test is governed by an irrebuttable presumption. *Once it is established that the prior matters are substantially related to the present case, "the court will irrebuttably presume that relevant confidential information was disclosed during the former period of representation."* [4]

The test is categorical in requiring disqualification upon the establishment of a substantial relationship between past and current representations. But we have never applied the test in a mechanical way that might 'prevent[ ] an attorney from ever representing an interest adverse to that of a former client.' Rather, a substantial relationship may be found only after 'the moving party delineates with specificity the subject matters, issues and causes of action' common to prior and current representations and the court engages in a "painstaking analysis of the facts and precise application of precedent." Finally, the party seeking disqualification bears the burden of proving that the present and prior representations are substantially related.

*In re American,* 972 F.2d at 614 (internal citations omitted and emphasis added).

### III.A.1. The Existence of an Actual Attorney–Client Relationship

 As noted above, under the substantial relationship test, the first question before the Court is whether an actual attorney-client relationship previously existed between the moving party and the attorney he seeks to disqualify. Here, the Court must modify the application of this question to the facts before the Court. That is, the movants seek to disqualify the Gibson Law Firm on the basis of the work of a paralegal, not an attorney. Unquestionably an attorney-client relationship existed between Forman Perry and Defendants, and no assertion has been made otherwise. The issue is whether Wilson's

---

**3.** The Court notes that "[t]his circuit adopted the substantial relationship test before the promulgation of the Rules of Professional Conduct." *In re American,* 972 F.2d at 614. Precedent, such as *In re American,* demonstrates that the test still applies alongside an analysis of the rules.

**4.** *A second irrebuttable presumption is that confidences obtained by an individual lawyer will be shared with the other members of his firm....*

work as a paralegal, in assisting Forman Perry when representing Defendants, is encompassed within the realm of that attorney-client relationship. The Court concludes that it is.

 While at Forman Perry, Wilson was exposed to, among other things, documents, strategy meetings, and settlement information which clearly fall within the realm of protected attorney-client information. *See* Billing Records of Wilson, attached as Exhibit "B" to Defendants' Motion to Disqualify.[5] When a paralegal works on behalf of a lawyer who is representing a client, "[t]he attorney-client privilege applies with equal force to paralegals." 81 Am.Jur.2d Witnesses § 400 (2005) (citing *Wal–Mart Stores, Inc. v. Dickinson*, 29 S.W.3d 796 (Ky.2000)). Thus, an actual attorney-client relationship existed as between Forman Perry and Defendants, and Wilson's work for Defendants while at Forman Perry is covered by the attorney-client privilege.

### III.A.2. The Existence of a Substantial Relationship Between Representations

 The next question is whether there is a substantial relationship between the subject matter of the former representation of Defendants by Forman Perry, and the representation of Plaintiffs by the Gibson Law Firm. "Two representations need only involve the same 'subject matter' in order to be substantially related." *In re American*, 972 F.2d at 625. Also, a substantial relationship exists when "the prior representation concerns 'the particular practices and procedures which are the subject matter of [Plaintiff's] suit.'" *Id.*

The action before the Court, and all of the actions on which Wilson worked while at Forman Perry, are traditional consumer

fraud actions, in which plaintiffs allege that a financial company wrongfully required certain insurance products be included with a loan. While Wilson never worked on this particular case while at Forman Perry, she was a supervising paralegal over numerous other consumer fraud actions involving these very same Defendants facing identical claims. In an attempt to meet the burden of " 'delineat[ing] with specificity the subject matters, issues and causes of action' common to prior and current representations," *In re American*, 972 F.2d at 614, Defendants place before the Court the language of the complaints involved in numerous actions involving these very same Defendants. For instance, each of the complaints filed by the Gibson Law Firm alleges that "[t]he Defendants' conduct in this case was part of a widespread and long established pattern and practice calculated to cheat [borrowers] such as plaintiffs." Reply Brief in Support of the Motion to Disqualify, p. 8. In addition,

a further review of *Complaints* (i.e. the subject matter of the lawsuits, as noted by *American Airlines*), reveals other similarities which establish that the matters are substantially related. For convenience, we will compare this case with the *Blue* case (one of the First Family cases that Wilson worked on while at Forman Perry). The *Blue Complaint* was itself identical to numerous other complaints (e.g., *Lockett* and *Brandon*), so to the extent that this Court believes it is similar to the current Complaint, Wilson worked on numerous cases just like it. It would be too lengthy to show in chart format the seventy-nine nearly identical allegations, but the chart below shows the first several:

**5.** There is dispute as to the level of involvement of Wilson in strategy meetings, as discussed *infra*, as well as to her exposure to settlement information. However, as the Court finds *infra*, because the matters are substantially related, it is irrebuttably presumed that Wilson was exposed to such confidential information.

| Current Case | Previous Cases |
| --- | --- |
| Plaintiffs had loans with 'credit life, credit disability, credit property, and/or other insurance products … and fees.' | Plaintiffs had loans with 'credit life, credit disability, property damage, … and/or other insurance products and fees.' |
| Defendants 'fraudulently concealed their wrongful conduct' and 'Plaintiffs failed to discover the facts … despite due diligence.' | Defendant engaged in 'fraudulent concealment of its wrongful conduct' and 'Plaintiffs were unaware … and could not have earlier discovered [it].' |
| Defendants 'required the Plaintiffs to purchase credit insurance.' | Defendant[s] 'required … insurance in connection with their loans to Plaintiffs.' |
| 'The premiums for the Defendants' insurance products were excessive and/or inflated in comparison to other similar insurance products available in the marketplace but not sold or offered by the Defendants.' | 'The premiums for Defendant's insurance products were excessive and/or inflated in comparison to other similar insurance products available in the marketplace but not sold or offered by the Defendant.' |
| 'The Defendants engaged in insurance packing by increasing the Plaintiffs' debt by padding or packing the amount financed through the sale of insurance products. Exorbitant interest rates were then charged by the … Defendants on the amount financed, which includes the insurance products.' | 'Defendant engaged in insurance packing by increasing Plaintiffs' debt by padding or packing the amount financed through the sale of insurance products. Exorbitant interest rates were then charged by Defendant on the amount financed, which includes the insurance products.' |

Indeed, **seventy-nine** of the paragraphs of the complaint are identical or almost identical. Another eight paragraphs are similar substantively. Likewise, six causes of action are the same: breach of fiduciary duties; fraudulent misrepresentation and/or omission; negligent misrepresentation and/or omission; civil conspiracy; negligence; and unconscionability. Fifth Circuit case law does not require identical cases; rather it requires them to be on the same subject matter: lending fraud.[6] Even a cursory review of these cases show that not only are they the same subject matter, but that the procedures and policies at issue are nearly identical.

6. By including this particular portion of this quote, the Court does not affirm the assertion that the matters are substantially related simply because lending fraud is at issue. Rather,

What is even more telling is that in the past, even Plaintiffs' counsel has admitted that these lending fraud cases involve nearly identical facts. For instance, the Plaintiffs moved to consolidate all nineteen cases where the Gibson Law Firm is counsel in these cases because they are 'based on virtually identical facts.' What this motion shows and what the similar complaints show is that the cases concern First Family's lending practices, procedures, and policies—which are the same in all cases—and not its uniquely wrongful conduct in one individual case.

Reply Brief in Support of Motion to Disqualify, pp. 8–10, filed June 6, 2005 (emphasis in original).

### III.B. Plaintiffs' Response to Defendants' Arguments Concerning Whether the Matters are Substantially Related

As a general response to the evidence and arguments above, Plaintiffs repeatedly state that in the cases on which Wilson worked while at Forman Perry, the Plaintiffs in those cases were different than the Plaintiffs in this case. But this statement misses the point. While the same Plaintiffs may not be involved, the same Defendants are. And so are the very same claims, and the very same documents on which this lawsuit and the others are based. Moreover, the fact that different Plaintiffs are involved does not change the method by which these Defendants may analyze potential settlements for consumer fraud actions, and under the substantial relationship test, Wilson is presumed to have been privy to such confidential information. At the Gibson Law Firm, the lawyers of the firm undoubtedly had at least the opportunity (under the presumption), however inadvertently, to gain ad-

the quote in included *in toto* because of the specifics it includes in demonstrating the similarity of the subject matters at issue.

vantage from confidential information Wilson may have gathered while working for Defendants.

### III.C. The Court Finds that the Subject Matter of the Former and Present Representations are Substantially Related

The Court finds the above evidence demonstrates that a substantial relationship exists between the subject matter of the work Wilson performed while at Forman Perry and the subject matter of the instant suit. And "[o]nce it is established that the prior matters are substantially related to the present case, 'the court will irrebuttably presume that relevant confidential information was disclosed during the former period of representation.'" *In re American*, 972 F.2d at 614.

### III.D. The Confidential Information Wilson is Presumed to have had Disclosed to her while at Forman Perry is Imputed to the Gibson Law Firm

 The effect of this finding is that Wilson's work at Forman Perry not only places her squarely within the language of Rule 1.9(a), but also within the language of Rule 1.6. That is because if a district court finds a matter to be substantially related under Rule 1.9(a), it must irrebuttably presume that confidential information, as protected by Rule 1.6, was disclosed during the former period of representation. This, in turn, brings about the application of Rule 1.10(b), as Rule 1.10(b) explicitly incorporates Rule 1.6. As noted above, Rule 10(b) deals with the imputation of the conflict of one lawyer of a firm to the rest of the firm.

 Rule 1.10(b) explicitly states that "[w]hen a lawyer becomes associated with a firm, the firm may not knowingly represent a person in the same or a substantially related matter in which that lawyer, or a firm with which the lawyer was associated, had previously represented a client whose interests are materially adverse to that person and about whom the lawyer had

acquired information protected by Rules 1.6 and 1.9(b) that is material to the matter." As is apparent from the text of Rule 1.10(b), it does not explicitly refer to a paralegal, and how the conflict of a paralegal might or might not impute to members of a firm. Neither the Fifth Circuit nor the Supreme Court of Mississippi has addressed how Rule 1.10(b) might apply to non-lawyer employees. Other courts, as noted by Defendants, have held that local rules which are similar or identical to Rule 1.10(b) apply to non-lawyer employees.

In *Zimmerman [v. Mahaska Bottling Co.*, 270 Kan. 810, 815–17, 19 P.3d 784, 788–90 (2001)], the Kansas Supreme Court held that the [Kansas Rules of Professional Conduct] applied not only to attorneys, but *also to nonlawyer employees. Id.* at 790[ ] (citing *Daines v. Alcatel,* S.A., 194 F.R.D. 678, 681 (E.D.Wash.2000)) (using Washington Rules of Professional Conduct [WRPC] 5.3 to apply WRPC 1.10 to nonlawyer employees); *Makita Corp. v. U.S.,* 819 F.Supp. 1099, 1104 (CIT 1993) (holding that Model Rule 5.3 requires courts to apply the same ethical standards to nonlawyer employees); *Smart Industries v. Superior Court,* 179 Ariz. 141, 14[5], 876 P.2d 1176 (1994) (holding that Ethical Rule [ER] 1.10(b) 'may be extended to the conduct of nonlawyers through ER 5.3); *Koulisis v. Rivers,* 730 So.2d 289, 291 (Fla.App.1999) (holding that under the applicable Rules Regulating the Florida Bar, which are similar to the KRPC, nonlawyers must be treated in the same manner as lawyers when considering issues of confidentiality and disqualification); [ ]; *Glover Bottled Gas Corp. v. Circle M Beverage Barn, Inc.,* 129 A.D.2d 678, 679, 514 N.Y.S.2d 440 (1987) (applying code of professional responsibility to paralegal in affirming disqualification of firm).

Memorandum in Support of Defendants' Motion to Disqualify, p. 11 (emphasis add-

ed). The Court, like other courts before it, agrees that Rule 1.10(b) applies to non-lawyer employees of lawyers.[7]

### III.E. The Counter–Arguments of Plaintiff to Rule 1.10(b)/Imputation

 In an attempt to escape the application of Rule 1.10(b), Plaintiffs make two arguments. Plaintiffs first argue that they created a "Chinese Wall" around Wilson, so that Wilson is now prohibited from working on consumer fraud actions.[8] Plaintiffs second argue that Defendants waived any conflict of interest.

### III.E.1. "Chinese Wall" Argument

 As to the first argument, the Fifth Circuit has never recognized the legitimacy of a "Chinese Wall" approach. *Hampton*, 2001 WL 1444933, at *2 (stating that "[t]he Fifth Circuit has never recognized the possibility of a 'Chinese Wall' to rebut [the] presumption" that "[t]he Rules presume that confidences obtained by an individual lawyer are shared with members of his or her firm"); *see also Green*, 1998 WL 24424, at *3 (stating that "[t]he Fifth Circuit has never recognized the possibility of a 'Chinese Wall' to rebut this presumption"). As the Fifth Circuit stated in *In re American*, in footnote 1, p. 614, once the irrebuttable presumption that confidential information was disclosed has been established, "[a] second irrebuttable presumption is that confidences obtained by an individual lawyer will be shared with the other members of his firm." The logical effect of this language is that a "Chinese Wall" cannot apply.

 Even if a "Chinese Wall" could apply, it would not in this instance. The Gibson Law Firm hired Wilson on April 6, 2004. Defendants did not object to the Gibson Law Firm and Wilson's involvement in these cases until September 22, 2004. On that date, the Honorable John R. Chiles of Burr & Forman, LLP, Defendants' current counsel, wrote the Gibson Law Firm. Mr. Chiles stated that he had recently become aware of Wilson's involvement in consumer fraud cases on behalf of Plaintiffs against Defendants, and that he had also become aware of Wilson's work on behalf of Defendants while at Forman Perry. Mr. Chiles stated:

> It is my understanding of the Rules of Professional Conduct that [Wilson's] knowledge of confidential matters and her prior service on these particular cases is similar to that of an attorney who changes firms. As a result, she cannot work on these cases and, having done so and provided information to your firm, it is probable that your firm is disqualified from handling these cases.
>
> I have discussed this matter with our client and the client is upset about this development and, at least at this point, is not inclined to waive any conflicts.

Chiles Letter, attached as Exhibit "H" to the Motion to Disqualify, pp. 1–2.

The Honorable Charles E. Gibson, III, of the Gibson Law Firm replied on October 15, 2004, and stated that "I was unaware she had worked for the defendants on the Dixon case or any other First Fami-

---

7. The Court notes that other courts have found support for this conclusion in the language of rules similar to Rule 5.3 of the Mississippi Rules of Professional Responsibility.

8. A " 'Chinese wall' is [a] procedure which permits attorney[s] involved in [an] earlier adverse role to be screened from other attor-

neys in [a] firm, so as to prevent disqualification of [the] entire law firm simply because one member of [the] firm previously represented [a] client who is now an adversary of [a] client currently represented by [the] firm." 7 Am.Jur.2d Attorneys at Law § 198 (2005) (citing *Kala v. Aluminum Smelting & Refining Co., Inc.*, 81 Ohio St.3d 1, 688 N.E.2d 258 (1998)).

ly and Citifinancial cases." Gibson Letter, attached as Exhibit "I" to the Motion to Disqualify. Mr. Gibson then stated that "[s]ince reviewing the applicable rules, comments and cases, I have determined that [Wilson] will not work on any cases involving First Family or Citifinancial. A 'Chinese Wall' has been established. [Wilson] will not discuss or assist in any way with the First Family or Citifinancial cases." *Id.*

█ It is perhaps true that from the date of receipt of Mr. Chiles letter, Mr. Gibson created a "Chinese Wall." Problematically, however, "[n]o one denies that Wilson was heavily involved in [Defendants] matters at the Gibson law firm until

September 22, 2004." [9] Reply Brief in Support of Motion to Disqualify, p. 30. Hence, "[e]ven if it were possible for the Gibson firm to avoid imputed disqualification by creating a 'Chinese wall' (it is not), they did not do so, and now having used Wilson for several months, they must be disqualified." *Id.*[10] The Court agrees.

### III.E.2. Waiver Argument

█ As to Plaintiffs second argument, they argue that Defendants waived any objections to Wilson's work in these matters. Defendants base this argument on the actions of Bob Walker, a former Burr & Forman attorney and counselor to Defendants. Rule 1.10 requires imputed dis-

---

9. Plaintiffs might disagree with the phrase "heavily involved," to the extent that Plaintiffs state that Wilson's involvement in Defendants' cases was limited to a "secretarial role." Plaintiffs' Response to Defendants' Motion to Disqualify, p. 6, ¶ 11. However, even assuming her role as a paralegal would be more aptly termed secretarial, that would not make her any less "heavily involved" under the law. *See e.g., Zimmerman*, 270 Kan. at 822, 19 P.3d 784 (holding that the use of a "Chinese Wall" could not be used to screen a secretary when she possessed confidential information). If the matters are substantially related, as the Court has found, Wilson is presumed to have confidential information. This is true regardless of whether Wilson's role is more aptly described as secretarial rather than as a paralegal. And if Wilson is presumed to have confidential information, then *even if* the Gibson Law Firm created a "Chinese Wall" around her secretarial duties on September 22, 2004, *they did nothing* from April 6, 2004, until that time. It is also for this reason that it is irrelevant that Wilson no longer works at the Gibson Law Firm. Regardless of the fact Wilson no longer works there, she could have, and is presumed to have, given information to other employees of the Gibson Law Firm during the time that she was there.

10. The Court also notes that Ms. Wilson wrote in a memo that "I presented to Gigi [Gibson] my resume and also informed everyone that I had previously worked at Forman Perry and that I worked on their Consumer Fraud cases

(Citifinancial) ... I was informed from the beginning that this was not an issue." Wilson Memo, attached as Exhibit "C" to Reply Brief in Support of Motion to Disqualify. Thus, the Gibson Law Firm was on notice of a potential conflict, and it had a duty to comply with Rule 5.3(b), which requires a "lawyer having direct supervisory authority over [a] nonlawyer [to] make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer." This was not done. Wilson was allowed to work on at least one consumer fraud case at *both* the Gibson Law Firm and Forman Perry. That case, *Rosa v. Dixon, involved the very same Defendants.* Wilson states the following in regard to her involvement in that case:

While at Forman Perry, I obtained loan files in that case to demand arbitration. No confidential data, legal theories or other information was ever seen by me or discussed with me. A review of my time sheet entries for 10/2/01 through 12/9/01 shows that I gathered data related to a Declaratory Judgment action which was filed and served on plaintiffs' counsel. The Rosa Dixon case is in arbitration thus the issues I worked on at Forman Perry are moot. I do not possess any confidential information regarding the Rosa Dixon case, plaintiffs or legal defenses.

Affidavit of Wilson, p. 4, ¶ 15, attached as Exhibit "C" to Plaintiffs' Response to Defendants' Motion to Disqualify.

qualification unless it is "waived *by the affected client* under the conditions stated in Rule 1.7." [11] There is no allegation that Walker, even if he had engaged in actions which would seem to indicate a waiver (which he did not), discussed this matter with Defendants or that Defendants consented to any waiver. In fact, Defendants objected upon first learning of the conflict. Therefore, the Court finds that Defendants did not waive any objections to the conflict at issue.

**III.F. The Additional Argument of Defendants that Wilson, while at Forman Perry, was in Fact Exposed to the Confidential Information of Defendants**

 In addition to the argument that the matters are substantially related, Defendants also argue that Wilson has

actually been exposed to the confidential information of Defendants.[12] As to this argument, Plaintiffs and Defendants have placed contradictory evidence before the Court. For instance, the affidavits of Plaintiffs and Defendants dispute one another as to the amount and type of information to which Wilson was exposed while at Forman Perry. On the one hand, Plaintiffs argue that Wilson's involvement in consumer fraud cases at Forman Perry was administrative or secretarial in nature. *See* Affidavit of Wilson, attached as Exhibit "C" to the Response to Defendants' Motion to Disqualify, filed December 13, 2004(characterizing her involvement as administrative in nature, and not as reviewing the substantive portions of the cases against Defendants).[13] On the other hand, De-

---

11. Rule 1.7 states:
 (a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless the lawyer reasonably believes:
 (1) the representation will not adversely affect the relationship with the other client; and
 (2) *each client has given knowing and informed consent after consultation.* The consultation shall include explanation of the implications of the adverse representation and the advantages and risks involved.
 (b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless the lawyer reasonably believes:
 (1) the representation will not be adversely affected; and
 (2) *the client has given knowing and informed consent after consultation.* The consultation shall include explanation of the implications of the representation and the advantages and risks involved.
 (Emphasis added).

12. *In re American,* 972 F.2d at 615(stating that
 [i]n providing two distinct grounds for disqualification, the Rules expand the protections for former clients beyond those afford-

ed by the substantial relationship test...While the focus of our cases has been on the substantial relationship test, we have indicated that a former client could also disqualify counsel by showing that his former attorney possessed relevant confidential information in the manner contemplated by Rule 1.09(a)(2)).

13. The Court notes that when considering the various statements by Wilson, it has considered her testimony in light of the statements of Gigi Gibson, the person who was responsible for the hiring of Wilson at the Gibson Law Firm. The following verbal exchange transpired during the deposition of Gigi Gibson:

 Q: Why was she fired? What was the...
 A: She was—seemed to be somewhat unreliable. She might say that she had done something, and then you would check behind her and find out that that wasn't exactly the way it had been.
 Q: Anything else?
 A: Yes. She tended to fabricate stories that often were not particularly relevant to work, but...

 * * * * * *

 Q: Is it fair to say that she couldn't be trusted to tell the truth?
 A: It think it's fair to say that I didn't trust her to tell the truth. Whether that was

fendants argue that Wilson's involvement in these cases included exposure to substantive portions of the representation of Defendants. *See*, Affidavit of Robert H. Walker, attached as Exhibit "A" to the Motion to Disqualify(stating that while at Forman Perry, Wilson attended meetings at which legal strategies and client related communications were discussed). In other words, Defendants argue that Wilson, while at Forman Perry, was doing more than simply blindly filing records, as Plaintiffs essentially maintain.

Two of the highlights of the dispute between the parties are whether Wilson attended the strategy sessions of Defendants and whether she was exposed to the settlement amounts of Defendants' previous consumer fraud cases.[14] With regard to strategy sessions, Defendants vigorously argue that Wilson, whether she realizes it or not, was exposed to the litigation strategy tactics of Defendants. *See e.g., Id.* As proof that Wilson was exposed to Defendants' strategy, Defendants rely upon affidavits, depositions, and the billing records of Wilson. With respect to Wilson's billing records, some of the arguments and evidence of the parties focuses on whether the billing records serve as proof that Wilson was active in strategy sessions. *See e.g.,* Affidavit of Wilson, attached as Exhibit "C" to Plaintiffs' Response to Defendants' Motion to Disqualify, p. 1, ¶ 5. A plain reading of Wilson's billing records clearly indicate that she was involved in strategy sessions. Billing Records of Wilson, attached as Exhibit "B," p. B–3, to the Motion to Disqualify(recording that Wilson spent one and a half hours in a "meeting with Sheila Bossier

[former Forman Perry attorney] regarding reports and [Defendants'] active cases as to long term strategies and goals"). Wilson disputes the impression of these billing records that she was actually exposed to substantive strategy. For instance, Wilson states, "I have reviewed the billing records attached as Exhibit B to the Motion. These records have been altered or edited and are not in the form in which I kept these time records. I was told [hearsay] they were edited and changed for billing purposes..." and that "I did not discuss legal strategies with attorneys." Affidavit of Wilson, pp. 1 & 3, ¶¶ 5 & 7(g), respectively, attached as Exhibit "C" to Plaintiffs' Response to Defendants' Motion to Disqualify. On the other hand, Wilson also admits that the billing records are substantively accurate, and that the tasks she was performing were not "administrative." Deposition of Wilson, pp. 36–38, attached as Exhibit "M" to the Motion to Disqualify.

With regard to the amounts for which Defendants settled in previous cases, Defendants state the following regarding Wilson's exposure to the settlement tactics of Defendants.

It is hard to imagine a more confidential type of information than the specific amount for which a client is willing to settle a particular type of case. Yet both Wilson's billing records and those who worked with her testified that she had access to settlement information. As Kopf put it—confirmed by Walker, Banks, and Slover-'Ms. Wilson work[ed] with settlement information.' This fact is confirmed repeatedly in her

---

my perception or reality is a whole different story, and I don't want to defame her in any way. But I did feel like she was somewhat unreliable.

Deposition of Gigi Gibson, pp. 35–36, attached as Exhibit "Q" to the Reply Brief in Support of the Motion to Disqualify.

**14.** The Court traces these arguments and the evidence presented even though, *infra*, the Court finds that it cannot confidently find that by a preponderance of the evidence, Wilson was actually exposed to confidential information.

billing records. She '[e]xamined previous settlements.' She '[r]eview[ed] with B[ob] Walker the likelihood of settlement analysis' and the 'status of B. Methvin's cases for settlement purposes.' In fact, she was even able to 'answer any specific questions related to the plaintiffs' info for settlement purposes.' She also worked with the 'settlement database,' and she met with people 'to clari[f]y pertinent information needed for settlement negotiations with attorneys.' In addition, she '[c]onferred with B. Walker regarding preparation and analysis of settlement inventory.' This settlement information that Wilson had access to is undisputedly confidential information.

Reply Brief in Support of Motion to Disqualify, p. 26(internal citations omitted). Other than general denials that Wilson has no knowledge of any confidential information, Plaintiffs, in their Response, do not directly dispute that Wilson was exposed to the settlement information of Defendants in past cases, nor do Plaintiffs point to any evidence that would directly contradict this assertion.

Because both Plaintiffs and Defendants are self-interested parties in this cause, Defendants have offered the deposition testimony of attorneys at Forman Perry. Forman Perry, while the previous counsel to Defendants, is a non-party to this action. Therefore, at least in theory, Forman Perry is a non-interested party. The Court finds this evidence persuasive.

In the depositions of the attorneys of Forman Perry the following was stated:

> Fred Krutz, the Forman Perry partner in charge of [Defendants'] litigation, gave a good description of the type of confidential information that Wilson knew:
>
>> [Stephanie knew] the good, the bad, and the ugly. . . .

[I]t is my recollection that Stephanie was in on a lot of the strategy meetings we had where we talked about the problems, the good points, the bad points, the good documents, the bad documents, and that's what knowledge she would have had, and I don't think that knowledge changes. Your opportunity to win changes as the law changes, and the environment gets more friendly, but the documents and the facts stay the same. . . .

I've been told . . . that there's some claim by Stephanie and/or you that she was essentially a file clerk, and would have not been privy to any confidential information. *That's just not true* . . . . She was in meetings. She was not just a file clerk. She went to all the branches and got all the documents. She was by nature a person who would never have been content to just be a file clerk. She was in strategy sessions. She was in meetings. She knew, as I said earlier, the good, the bad and the ugly. . . . [I]f I was in CitiFinancial's situation, I would be a little shaky, worrying, wondering about whether she remembered it or not. I wouldn't take that risk.

Bob Walker, an attorney who worked closely with Stephanie Wilson on First Family cases, also discussed Wilson's role in the firm:

> Stephanie Wilson attended meetings with attorneys at Forman Perry[ ] wherein legal strategies and client-related communications were discussed.
>
> . . . . .
>
> [These strategies include] the legal strategies associated with the defense of these individual lawsuits and the lawsuits of that type, in particular, and how we propose to defend them on behalf of our clients. . . .

[T]he way and the manner in which those defenses would be undertaken and the strategy for employing those defenses was discussed in these meetings.

.　　.　　.　　.　　.

She actually met with us on—met with me on a regular, if not daily basis, to talk about where we were going in defense of these cases. She also talked to the client and interviewed Ms. Wilson [in-house counsel for CitiFinancial and First Family] here and assisted us in getting information from her that would be used or reflected in the defense of our cases and planning of the strategy.

Finally, Roland Slover, another lawyer at Forman Perry for whom Ms. Wilson worked, testified as follows:

Ms. Wilson participated in meetings with lawyers where strategies for defending cases were discussed, and she had extensive contact with in-house counsel for First Family and was involved in preparing monthly reports to inhouse counsel about the status of cases we were defending. She was also involved with gathering documents for production to opposing counsel, and she knew which documents were helpful to the client and which documents could be construed as potentially harmful to the client. Ms. Wilson was also privy to settlement agreements with plaintiffs, and reviewed and maintained videotapes of a mock trial and the analysis of that mock trial in which all of the client's strategies for defending this type of case were laid out. She also helped me prepare for a number of consumer fraud cases for First Family that were set for trial, and as a result, she was intimately familiar with the manner in which we intended to defend those cases.

It is worth noting that Messrs. Krutz, Walker, and Slover no longer represent First Family or CitiFinancial, and as a result, they have absolutely no stake in the outcome of this Motion to Disqualify. Reply Brief in Support of Motion to Disqualify, pp. 23–24(emphasis in original).

In relation to the evidence above, the Court recognizes that there is an issue with respect to how much and of what type of information Wilson, as a paralegal, may or may not have been exposed. It is no doubt for this reason that Plaintiffs stated that "[t]his Court should either hold an evidentiary hearing on this matter to make this determination or carefully examine the factual affidavits of both sides." Memorandum in Support of Plaintiffs' Response to Defendants' Motion to Disqualify, p. 21. The Court has carefully examined the factual affidavits and other evidence of both sides. While the Court is inclined to believe that Wilson was actually exposed to confidential information, the Court cannot state with confidence that Defendants have demonstrated by a preponderance of the evidence that Wilson actually had confidential information.

This determination takes the Court to Plaintiffs' request that the Court hold an evidentiary hearing. Although the Court cannot find, based on the evidence before it, that Wilson actually had confidential information, the Court need not make such a finding to reach its resolution. Under the substantial relation test, it is irrebuttably presumed that Wilson has confidential information. An evidentiary hearing will not change this presumption regardless of the results. Therefore, the request for an evidentiary hearing is denied.

### III.G. Appearance of Impropriety

■ As to the entire analysis above, a prevailing consideration of the Court is that "[The Fifth Circuit has] applied par-

ticularly...the admonition of canon 9 that lawyers should 'avoid even the appearance of impropriety.' " *In re Dresser*, 972 F.2d at 543. The Court cannot allow the continued representation of Plaintiffs in this action by the Gibson Law Firm, and simultaneously adhere to this principle of canon 9.

## IV. Conclusion

IT IS THEREFORE ORDERED that the Motion of Defendants to Disqualify [34] is well taken and is hereby granted. The Gibson Law Firm, Charles E. Gibson, III, Edward Gibson, IV, Gigi Gibson, and all other associates affiliated with the Gibson Law Firm are hereby disqualified from representing Plaintiffs in this matter.

IT IS FURTHER ORDERED that consistent with *In re George*, 28 S.W.3d 511 (Tex.2000), the Gibson Law Firm is not to disseminate attorney work product associated with its work on this matter.[15] In order to assist with the transfer of files in this case to Plaintiffs' next counsel, Plaintiffs, upon finding new counsel, are to contact Ann Nelson, 601–965–4545, to schedule an *in camera* proceeding. During this proceeding the files can be inspected to insure that work product is not transferred to new counsel. The Gibson Law Firm is not to transfer *any* files until this *in camera* proceedings is held.

---

**15.** In *In re George,* at 28 S.W.3d at 526, the Supreme Court of Texas stated that "there is no practical way short of banning the transfer of work product to make sure the policies behind disqualification are fulfilled."